UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------X
MARY WILLIAMS,

                                          **MEMORANDUM & ORDER**

            Plaintiff,                     15-CV-7098 (DRH)(AYS)

      -against-

COUNTY OF NASSAU, NASSAU COUNTY
SHERIFF'S DEPARTMENT, NASSAU COUNTY
CORRECTIONAL CENTER, MARY ELISABETH
OSTERMANN, in her individual and official capacity,
ANTONIO PATINO, in his individual and official
capacity, SERGEANT STEVEN O'MALLEY, in his
individual and official capacity, ACTING SHERIFF
MICHAEL J. SPOSATO, in his individual and official
capacity, and OFFICER PHIL LONIGRO, in his
individual and official capacity,

             Defendants.
-----------------------------------------------------X

**APPEARANCES:**

**For Plaintiff**
Law Offices of Frederick K. Brewington
556 Peninsula Boulevard
Hempstead, New York 11550
By: Cathryn Harris-Marchesi, Esq.

**For Defendants:**
Bee Ready Fishbein Hatter & Donovan, LLP
170 Old Country Road
Mineola, New York 11502
By:    Deanna D. Panico, Esq.

**HURLEY, Senior District Judge:**

       Plaintiff Mary Williams ("Plaintiff" or "Williams") commenced this action

asserting claims pursuant to Title VII, 42 U.S.C. § 2000e et seq., 42 U.S.C. §§ 1981

and 1983, and New York Executive Law § 296 against defendants County of Nassau ( "Nassau"), Nassau County Sheriff's Department, Nassau County Correctional Center , Mary Elisabeth Ostermann ("Ostermann"), Antonio Patino ("Patino"), Sergeant Steven O'Malley ("O'Malley"), Acting Sheriff Michael J. Sposato ("Sposato'), and Officer Phil Lonigro ("Lonigro). By Memorandum & Order dated March 30, 2017, the claims against the Sheriff's Department and the Nassau County Sheriff's Department, as well as all of the NYSHRL and Section 1983 conspiracy claims, were dismissed. Presently before the Court is a motion for summary judgment by defendants Nassau, Ostermann, Patino, O'Malley, Sposato and Lonigro (collectively "Defendants") on Plaintiff's remaining claims, viz., hostile work environment and retaliation under Sections 1981 and 1983 and Title VII[1]. For the reason set forth below, the motion is granted.

## BACKGROUND

The following facts are taken primarily from the parties' 56.1 Statements and are undisputed unless otherwise noted.

### A.    Plaintiff's Assignment History as a Corrections Officer

Plaintiff, an African-American female, was hired as a Correction Officer by the County on or about March 16, 2001. At the time of her hire, she was informed that she would be working the following rotating schedule: work five days from 8:00

---

[1] The Title VII claims are assertable only against the County as Title VII does not create liability in individuals who are not plaintiff's actual employers. *See, e.g., Littlejohn v. City of New York*, 795 F.3d 297, 313 (2015).

am to 4:00 pm, followed by two days off, then work five days from 4:00 pm to 12:00 am, followed by three days off. (Pl.'s 56.1 Resp. at ¶¶ 1-3.)

After completing training, Plaintiff's first assignment was to Meal Platoon 4, with her hours being 11:00 am to 7:00 pm. On June 2, 2002, she was reassigned to Security Platoon 7. From that date until August 2007, she worked in either Security Platoon 7 or Security Platoon 1 with an 8 to 4, 4 to 12 rotating schedule. In August 2007, Plaintiff was reassigned to the Visiting/Medical Unit, which was a "split tour" and worked a rotating shift of 8:00 am to 4:00 pm and 11:00 am to 7:00 pm. (Pl.'s 56.1 Resp. at ¶¶ 4-10.)

Plaintiff was reassigned to the Medical Transportation Unit on July 6, 2009 where she worked the 12:00 pm to 8:00 pm shift for nearly four years. In late 2012, Plaintiff began working an 8:00 am to 4:00 pm shift within the Medical Unit.[2] At her request, on February 23, 2015 Plaintiff was reassigned from the Medical Unit to Security Platoon 5. In or about August 2015, after an absence due to knee surgery, Plaintiff was placed on restricted (light) duty, which is where she has remained. (Pl.'s 56.1 Resp. at ¶¶ 12-17.)

**B.    The Medical Unit and the September 16, 2014 Incident**

The Medical Unit provides care and treatment to inmates who need medical attention.  It is located within two building at the Nassau County Correctional Center: the D Building and the Satellite Building. Numerous individuals work

---

[2] According to Lt. O'Malley's deposition testimony, this change occurred because the Sheriff instituted a policy change whereby employee were to work standardized tours, ie. working either 8 to 4, 4 to 12, or rotating between 8 to 4 and 4 to 12.

within the Medical Unit who are not employed by the County as Armor Medical, an outside company, supplies medical service at the facility. As such, Armor Medical supplied doctors, nurses, dental assistants, custodial staff, physical therapists and individual to handle medical records. The Medical Unit is open twenty-four hours per day and both inmates and Armor employee have access to the unit at night. (Pl.'s 56.1 Resp. at ¶¶ 19-22.)

According to Defendants, inmates line-up along the walls, within the Medical Unit and wait to be called into a particular room for treatment. More specifically, they contend that as only one inmate at a time can fit into the dental office, inmates will line-up along the wall outside the dental off waiting to be seen. Plaintiff counters that inmates wait in a holding pen outside of the Medical Unit and with respect to the dental office "rarely is there a line of inmates waiting outside the pen and if there is an inmate, outside the pens, waiting to be seen, said inmate is made to stand against the wall across from the dental office." And, "there was never more than two inmates lined up waiting of treatment in the medical unit at the dental office and that this was a rare occasion, in which case the inmate would be supervised." It is undisputed that inmates regularly pass through the door to the dental office and it is possible (although unlikely, according to Williams) that an inmate could come across one of the sharp objects kept within the Medical Unit. Moreover, inmates are not searched or subject to a "pat-down" before entering the unit. (Pl.'s 56.1 Resp. at ¶¶ 23-28.)

On September 16, 2014, Plaintiff was assigned to the Medical Unit within the Satellite Building. Having volunteered to work overtime that morning, she arrived at 5:30 am. According to Plaintiff, there were five corrections officers working the morning shift that day and approximately twenty-five officers that worked in the medical unit. When she arrived, she greeted her co-worker, Craig Richardson, and, as she was doing so, observed two etchings on the doorframe that led to the dental office. On one side of the door frame were the letters "KKK," with each letter about two inches in height. On the other side of the door frame was a half finished swastika, about three inches in height. Plaintiff has no idea when the etchings were made; she does not know if they were made on September 16 or sometime earlier. (Pl.'s 56.1 Resp. at ¶¶ 29-34; Pl.'s Counter 56.1 at ¶¶ 3, 25.)

Plaintiff called her supervisor, defendant O'Malley, and notified him of the offensive etchings. O'Malley directed her to provide a written statement regarding the incident, which she did. After being called, O'Malley met Plaintiff in the Satellite Building. He also met the tour commander, Lt. Kerzner, who had already ordered photographs to be taken of the etchings. O'Malley went down to the Medical Unit with Lt. Kerzner to see the etchings. O'Malley covered the etchings with a piece of paper until they could be removed.  O'Malley spoke to an Officer Jenkins from the Communications Unit and directed him to contact Capt. Rogers, who was O'Malley's supervisor. At approximately 9:10 am and 9:15 am O'Malley received telephone calls from Deputy Undersheriff Smith and Sheriff Sposato, respectively, and apprised each of them of the situation. An investigating officer from the

Internal Affairs Unit, Officer Peirce, arrived at the Medical Unit and took photographs of the etchings. O'Malley conducted an inspection of the entire Medical Unit to see if there were any additional etchings. O'Malley remained with Plaintiff and stayed in the Satellite Building until the etching were removed, which occurred approximately two to three hours of Plaintiff's initial report.[3] At no time during this two to three hour period did Plaintiff request to go home for the day. (Pl.'s 56.1 Resp. at ¶¶ 35-47.)

Upon returning to his office, O'Malley drafted two report regarding the etchings, one to Capt. Rogers and the other to the Affirmative Action Bias Unit. Plaintiff also reported the incident to defendant Patino, an affirmative action officer. Plaintiff was out sick for several days after she observed the etchings. (Pl.'s 56.1 Resp. at ¶¶ 48-49, 53.)

On September 22, 2014, defendant Sposato issued Order Number 24-14 which read as follow:

<u>UNAUTHORIZED SIGNS, MARKINGS, PICTURES & OTHER MATERIALS</u>

This Order serves as a reminder to all staff that the display, circulation or posting of unauthorized signs, markings, pictures and any other printed material that denigrates or shows hostility or aversion toward any individual or group is strictly prohibited and will not be tolerated

---

[3] The Court notes parenthetically that in an apparent contradiction, Plaintiff admits that the etchings "were removed the same day Plaintiff reported them and in approximately two to three hours after [her] initial report" but notes that defendant Patino testified at his deposition that they were not removed until September 22, 2014. (Pl.'s 56.1 Resp. at ¶ 46.) Plaintiff is bound by her admission that the etchings were removed within two to three hours as that admission is consistent with her deposition testimony. (*See, e.g.,* Williams Dep. at 63.)

under any circumstances. Any staff member engaging in such conduct will be subject to immediate disciplinary action.

All supervisors are responsible to make certain that their respective areas of command are free from any such materials at all time and to take immediate corrective action in the event that nay such materials are discovered. The discovery of any such materials shall be properly documented and promptly reported via the appropriate Chain of Command.

[signed]
Michael J. Sposato
Sheriff

<u>TO BE READ AT THE NEXT 12 LINEUPS & POSTED IN ALL OUTSIDE UNITS</u>

(Pl.'s 56.1 Resp. at ¶50;  Ex. E to Harris-Marchesi Declar.)

On September 23, 2014, Plaintiff meet with Patino. He advised her of the step he had taken regarding her report. This included communicating with the Internal Affairs Division to request photographs of the etchings and inquiries to Plaintiff's supervisors as to who had access to the area and whether there were cameras in the area where the etchings were found. According to Patino he was told that there are inmate in the area, as well as Armor employees and that there are no cameras.  Patino provided Plaintiff with a copy of the County's EEO Policy and EEO complaint form, which he asked Plaintiff to fill out. Plaintiff returned the completed form to Patino on September 29, 2014. She admits that there are no cameras in the area, that inmates and Armor Employees, in addition to corrections officers, can be found in the area and that there were no witnesses who admitted either to making the etching or seeing who did. While Plaintiff listed corrections officer Richardson as a witness on her EEO complaint, she admits that he only saw the etchings and

stated that he did not observe who made them. In her complaint, she requested that Defendants conduct training for all corrections officers regarding diversity and bias. (Pl.'s 56.1 Resp. at ¶¶ 56-61, 65.)

On October 6, 2014, Plaintiff met with Patino and Ostermann. During that meeting Osterman told Plaintiff that there were no witnesses or cameras at the location of the etchings. According to Plaintiff's deposition testimony, Ostermann asked her what she wanted to be done about the situation. "[Ostermann] said there was no investigation cause [sic] it was unfounded. They couldn't find anyone. They couldn't pin it on anyone because there was [sic] no cameras. What more did I want her to do. . . .I asked her, there's nothing that could be done about it, I questioned it, and she said, no." (Williams Dep. at 90-91; Pl.'s 56.1 Resp. at ¶¶ 63-65.)

In December 2014, the Sheriffs Department required all correctional officers to attend cultural diversity. Although this training was planned prior to Plaintiff's complaint regarding the etchings and was not directly in response thereto, according to Ostermann she contacted the instructor and specifically requested that he include a discussion of hate symbols in the training. While Defendant maintains that Plaintiff refused to attend, Plaintiff asserts that she had an anxiety attack when she went to the diversity training to find she was the only African American Corrections Officer in the room, although she acknowledges that the instructor was African American. (Pl.'s 56.1 Resp. at ¶¶ 51-52,77, 79; Ostermann Dep. at 49-62.)

**C.    The October 17, 2014 Incident with Lonigro**

On October 17, 2014 Plaintiff was working as an escort officer within the Mental Health Unit. As such, she was responsible for retrieving inmates from their dorms and transporting them to the unit for care and treatment.  Lonigro was also assigned to the Mental Health Unit that day. He went into the "bubble, i.e. the area where officers unlock the doors that separate various sections of the jail to allow or disallow officers and inmates to move through the various sections." Officers in the Medical Unit bubble also control the holding pens where inmates are kept while they are waiting to be seen. That day, Officer Price was also working in the Mental Health Unit  and asked the officers in the bubble to send in another inmate, Lonigro responded "no." At that time there were already four or five inmates in the hallway waiting to be seen. Plaintiff then approached Lonigro and again asked him to send in another inmate. According to Plaintiff the following then occurred: Lonigro responded "No, I'm not sending you shit." Because Plaintiff "felt that he was wrong, he was rude," she said to him "don't f'ing curse at me." Lonigro then said "he do it again, and he was loud." Plaintiff "really got upset and . . . stopped and ... went back to  . . . where [she] was sitting and [Lonigro] stayed in [the bubble with the other officer]." Following the dispute with Lonigro, Plaintiff requested permission to leave early; her request was granted. (Pl.'s 56.1 Resp. at ¶¶ 68-75.)

### D.    The Request to Transfer

In a telephone call with O'Malley on November 6, 2014, Plaintiff informed him she would be submitting a request for transfer out of the Medical Unit. O'Malley received that request, dated November 6, 2014 , on November 12, 2014 and forwarded it up the chain of command to Captain Rogers. The request stated as follows:

> I have spoken to Mr. Patino and Ms. Ostermann the EEO Director about the markings on the wall in the medical unit September 16, 2014 and they said the file is closed as of October 6, 2014 and there's nothing they can do for me. I would like to be removed from medical do [sic] to the fact that I am not comfortable and I do not want to work in a hostile environment, Please look into moving me into anyone one of these positions: 7-3, 8-4, or 9-5 Records, Communications, computers, Sheriffs lobby or female clothing room. Thank you in advance.

On February 6, 2015, her request was granted to the extent that she was transferred to a Security Platoon. Officers working within a Security Platoon work a rotating schedule of 8:00 am to 4:00 pm; 4:00 pm to 12:00 am. Plaintiff admits that she was unaware whether there were any available position in the units referenced in her request. She also admits that she had no issue with the transfer other than having her schedule change to a rotating shift.  Her title and benefits were not affected by the transfer and her salary increased due to the shift differential for the 4:00-12:00 shift. (Pl.'s 56.1 Resp. at ¶¶ 87-93; Ex. F to Harris-Marchesi Declar.)

In August 2015, after returning from a knee injury, Plaintiff went on light duty. She remains in a Security Platoon, where she is assigned to the "bubble" at the delivery gate. (Pl.'s 56.1 Resp. at ¶¶ 111-112.)

### E.    Plaintiff's NYS Discrimination Complaint

On November 14, 2014, Plaintiff filed a discrimination complaint with the New York State Division of Human Rights.

### DISCUSSION

## I.    Summary Judgment Standard

Summary judgment, pursuant to Rule 56, is appropriate only where the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The relevant governing law in each case determines which facts are material; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When making this determination, a court must view all facts "in the light most favorable" to the non-movant, *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014), and "resolve all ambiguities and draw all permissible factual inferences in favor of the [non-movant]," *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)). Thus, "[s]ummary judgment is appropriate [only] where the record taken as a whole could not lead a rational trier of fact to find for the [non-movant]." *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)) (internal quotation marks omitted).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials

setting forth specific facts demonstrating that there is a genuine dispute of material fact to be tried. *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). The non-movant must present more than a "scintilla of evidence," *Fabrikant v. French*, 691 F.3d 193, 205 (2d Cir. 2012) (quoting *Anderson*, 477 U.S. at 252), or "some metaphysical doubt as to the material facts," *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (quoting *Matsushita*, 475 U.S. at 586-87), and "may not rely on conclusory allegations or unsubstantiated speculation," *Id.* (quoting *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010).

The district court considering a summary judgment motion must also be "mindful . . . of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because the "evidentiary burdens that the respective parties will bear at trial guide district courts in their determination[s] of summary judgment motions," *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). "[W]here the [non-movant] will bear the burden of proof on an issue at trial, the moving party may satisfy its burden by pointing to an absence of evidence to support an essential element of the [non-movant's] case." *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014) (quoting *Brady*, 863 F.2d at 210-11) (internal quotation marks omitted). Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish his claim, the burden shifts to the non-movant to offer "persuasive evidence that his claim is not 'implausible.' " *Brady*, 863 F.2d at 211 (citing *Matsushita*, 475 U.S. at 587). "[A] complete failure of

proof concerning an essential element of the [non-movant's] case necessarily renders all other facts immaterial." *Crawford*, 758 F.3d at 486 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## II.     Hostile Work Environment Claim

### A.     Applicable Law

Title VII prohibits an employer from discriminating against an employee on the basis of race, color, religion, sex, or national origin. *See* 42 U.S.C. § 2000e-2(a)(1). These prohibitions encompass "requiring people to work in a discriminatory hostile or abusive environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993).

Where a claim of hostile work environment is asserted, the plaintiff must demonstrate, he or she is a member of a protected class and "that [his or] her workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [his or] her work environment . . . ." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (quotation marks omitted). This standard is a "demanding one," *Scott v. Mem'l Sloan-Kettering Cancer Ctr.*, 190 F. Supp. 2d 590, 599 (S.D.N.Y. 2002), requiring that a plaintiff establish both objective and subjective components, to wit, "not only that [the plaintiff] subjectively perceived the environment to be abusive, but also that the environment was objectively hostile and abusive." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 102 (2d Cir. 2010); *see also Demoret v. Zegarelli*, 451 F.3d 140,

149 (2d Cir. 2006) ("Plaintiff must show not only that she subjectively perceived the environment to be abusive, but also that the environment was objectively hostile and abusive."). Furthermore, "there must be a specific basis for imputing the conduct creating the hostile work environment to the employer." *Doner–Hendrick v. N.Y. Inst. of Tech.*, 2011 WL 2652460, at *5 (S.D.N.Y. July 6, 2011) (internal quotation marks omitted).

"Isolated incidents typically do not rise to the level of a hostile work environment unless they are 'of sufficient severity' to 'alter the terms and conditions of employment as to create such an environment.' " *Demoret*, 451 F.3d at 149 (quoting *Patterson v. Cnty. of Oneida,* 375 F.3d 206, 227 (2d Cir.2004)). Rather, "[c]ourts look at all circumstances to ascertain whether an environment is sufficiently hostile or abusive to support a claim." *Leibovitz v. N.Y. City Transit Auth.*, 252 F.3d 179, 188 (2d Cir. 2001). "Among the factors to be considered in determining whether conduct is sufficiently hostile under the totality of the circumstances are: frequency; severity; whether the conduct is physically threatening or humiliating; and whether it interferes with an employee's performance." *Scott*, 190 F. Supp. 2d at 599 (citing *Harris*, 510 U.S. at 23). "[T]he Second Circuit has made it clear that insensitive comments are not per se unlawful." *Id.* (citing *Williams v. County of Westchester,* 171 F.3d 98, 101 (2d Cir. 1999)); *see Preuss v. Kolmar Lab., Inc.*, 970 F. Supp. 2d 171, 184 (S.D.N.Y. 2013) (The "mere utterance of an epithet which engenders offensive feelings in an

employee does not sufficiently affect the conditions of employment to establish a hostile work environment claim.") (internal quotation marks omitted).

It is necessary for the plaintiff to establish a link between the actions by defendants and plaintiff's membership in a protected class. *Alfano v. Costello,* 294 F.3d 365, 374 (2d Cir. 2002); *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001).

## B. Application to the Present Case

In support of her hostile work environment claim, Plaintiff points to the following: (1) the etching themselves; (2) "jokes" made by a dental assistant, Ms. Laucella Silvana, about the KKK standing for the three Kardashian sisters, for which she was not reprimanded; (3) the failure of Ostermann and Patino "to conduct a full investigation," including going to the Medical Unit to inspect the etchings for themselves and interviewing any of the corrections officers and medical staff that worked in the medical unit; (4) the failure to address the etching in training other than to ask the diversity trainer to include hate symbols in the training; (5) the failure to take any action with regard to her February 18, 2015 EEO complaint regarding Dr. Longo, a mental health doctor who worked for Armor Health Services, or her complaint regarding Lonigro; (6) the failure to transfer her to any of the units she proposed so that she could work only a day shift as her daughter's epilepsy required her to be home during the evening hours; and (7) the denial of her request for a reasonable accommodation based on her daughter's disability. [4]

---

[4] Plaintiff makes a passing reference to her co-workers treated her "differently" after the etchings incident. However, such a conclusory allegation is insufficient to withstand a motion for summary

Under the circumstances of this case, the items listed above are insufficient to permit a reasonable finder of fact to find that Plaintiff's workplace was permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of her employment.

Turning first to the etchings themselves, while certainly offensive, the mere observance of them does not support a hostile work environment as they were an isolated incident and were removed within hours after their discovery. *See Davis v. N.Y. Dept. of Corrections*, 256 F. Supp. 3d 343, 353-54 (S.D.N.Y. 2017) (racist graffiti does not rise to the level of pervasive and abusive work environment) (citing cases); *see also Woodland v. Joseph T. Ryerson & Son, Inc.*, 302 F.3d 839, 843–44 (8th Cir. 2002) (six racist comments, dissemination of racist and homophobic poem, and drawings of "KKK," a swastika, and a hooded figure in restroom, which drawings were promptly removed, were insufficient to create a hostile work environment). The cases cited by Plaintiff do not warrant a contrary conclusion. For example in *Williams v. New York City Housing Auth*, 154 F. Supp. 2d 820, a motion to dismiss a hostile work environment claim was denied where it was alleged that a white supervisor displayed a noose in his office for three days and only removed it when confronted by a plaintiff. In any event, even assuming the etchings

---

judgment. *D'Antonio v. Petro*, 2017 WL 1184163, * 6 (E.D.N.Y. Mar. 30, 2017) (holding claims that the defendant socially isolated, put pressure on and scrutinized the plaintiff were insufficient to withstand a motion for summary judgment).

themselves are sufficient to alter the conditions of Plaintiff's work environment, there is nothing to support imputing liability for the etching upon the employer.

Preliminary, the Court observes there is no evidence that any of Plaintiff's supervisors were involved in making the etchings. Moreover, the County provided a reasonable avenue to complain. The County maintains an EEO Department that is responsible for accepting and investigating complaints of discrimination and the County's EEO policy is distributed to all employees, including Plaintiff, who admits she received training with respect to that EEO policy. Indeed, as framed by the parties, the question is whether the County took appropriate remedial action.

In the Second Circuit "[t]he appropriateness of an employer's remedial action" in response to an employee's complaint of a co-worker's harassment must be assessed from the totality of the circumstances." *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 153 (2d Cir. 2014) (internal quotation marks omitted). An employer cannot be subject to a hostile work environment claim if the "employer has in good faith taken those measures which are both feasible and reasonable under the circumstances to combat [the] offensive conduct." *Snell v. Suffolk Cty.*, 782 F.2d 1094, 1104 (2d Cir. 1986) (quoting *DeGrace v. Rumsfeld*, 614 F.2d 796, 805 (1st Cir. 1980)); *accord Duch v. Jakubek*, 588 F.3d 757, 766 (2d Cir. 2009) ("[W]hether a company's response was reasonable has to be assessed from the totality of the circumstances. Factors to be considered in this analysis are the gravity of the harm being inflicted upon the plaintiff, the nature of the employer's response in light of the employer's resources, and the nature of the work environment. If the evidence

creates an issue of fact as to whether an employer's action is effectively remedial and *prompt,* summary judgment is inappropriate.") (internal quotation marks omitted).

"In the context of racist graffiti, when graffiti is reported to the employer and the employer promptly removes the offending language, the employer has taken appropriate remedial action." *Davis v. N.Y. Dept. of Corrections,* 256 F. Supp. 3d 343, 353 (S.D.N.Y. 2017) (quoting *EEOC v. Rock–Tenn. Servs. Co.*, 901 F. Supp. 2d 810, 827 (N.D. Tex. 2012) (citing *Pedigo v. Nat'l Cart Co.*, 95 F. Appx. 847, 848 (8th Cir. 2004))). Here it is undisputed that the etchings were removed within 2-3 hours after Plaintiff's report. That, however, was not the only action taken by the County. Photographs of the etchings were taken of the etching at the direction of Lt. Kerzner, as well as by the IAU. Upon Plaintiff's report, the matter was reported up the chain of command and, that same week, Sheriff Sposato issued the Order stating that discriminatory markings will not be tolerated and that any staff engaging in such conduct would be subject to immediate discipline and required that his Order "<u>BE READ AT THE NEXT 12 LINEUPS & POSTED IN ALL OUTSIDE UNITS</u>." . A discussion of hate symbols was added to the cultural diversity training scheduled for December 2014. And while a "full investigation" to try to determine who made the subject etchings was not conducted, no reasonable trier of fact could conclude that the decision not to conduct such an investigation was unreasonable in light of the absence of cameras in the area, that the approximately 25 corrections officers assigned to the Medical Unit and numerous

Armor Health Services staff had unrestricted access to the area[5], and the lack of

information as to when the etching might have been made.

Plaintiff's argument that the County should have done more, for example,

conduct "sensitivity training" and conduct a full investigation including

"investigating C.O. Schmidt, who Plaintiff identified to Defendant Patino as a likely

perpetrator . . . ." is unpersuasive. Similar arguments were rejected by the Second

Circuit stated in *Russell v. New York University*, 739 F. Appx. 28 (2d Cir. June 25,

2018):

> [Plaintiff] argues that "[a] reasonable juror could find that the NYU
> response was inadequate because NYU could have easily done more."
> But "[a]n employer need not prove success in preventing harassing
> behavior in order to demonstrate that it exercised reasonable care in
> preventing and correcting [the] harassing conduct." *Whidbee v.*
> *Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 72 (2d Cir. 2000)
> (quoting Caridad v. Metro–North Commuter R.R., 191 F.3d 283, 295
> (2d Cir. 1999) ). There is only so much that NYU—a private university
> lacking the subpoena power of a government agency—can do to
> investigate misconduct. *See Snell*, 782 F.2d at 1104 (explaining that
> courts should take into account "the resources available to the
> employer" when evaluating whether an employer's response to co-
> worker harassment is "reasonable"). Second, [plaintiff] argues that she
> provided NYU with the names of five professors whom she suspected of
> being responsible for the harassment, and NYU failed to single out
> each of these professors and "warn" them. But as the district court
> correctly concluded, [plaintiff] "provides no legal support for the
> proposition that NYU had a duty to take particular steps against
> particular individuals based solely on her speculative say-so."

*Id*. at 31 (citations to record omitted); *see Knabe v. Boury Corp.*, 114 F.3d 407, 412

(3d Cir. 1997 ("Even if a company's investigation into complaints of sexual

harassment is lacking, the employer cannot be held liable for the hostile work

---

[5] For purposes of this motion, the Court assumes that an inmate would lack the necessary access
and/or tools to make the etchings.

environment created by an employee under a negligence theory of liability unless the remedial action taken subsequent to the investigation is also lacking. In other words, the law does not require that investigations into sexual harassment complaints be perfect. Rather, to determine whether the remedial action was adequate, we must consider whether the action was "reasonably calculated to prevent further harassment.); *Id*. at 414 ("[I]f the remedy chosen by the employer is adequate, an aggrieved employee cannot object to that selected action. Concomitantly, an employee cannot dictate that the employer select a certain remedial action.")

In sum, under the totality of the circumstances, no reasonable trier of fact could conclude that the actions taken by the County in response to Plaintiff's complaint regarding the etchings were unreasonable.

With regard to the statements by the dental assistant, Plaintiff admits that it was a single incident and Plaintiff failed to report it at the time it made. (Williams Dep. at 99-100.) In fact, it was not until over a month later that she referenced the incident in her 85-I report form. (Ex. Q to Harris-Marchesi Declar.) While the statement was insensitive, it was not sufficient to alter the conditions of Plaintiff's employment. *Cf. Marshall v. New York City Bd. of Elections*, 322 F. Appx. 17, 18-19 (2d Cir. 2009) (allegations that plaintiff's supervisor "displayed a violent temper, stood over her with clenched fists on several occasions, disparaged her educational background, and engaged in crass behavior" while "troubling" do not support a

claim for hostile work environment as discrimination laws are "not a general civility code for the American workplace; it prohibits only harassment that is

discriminatory.") (internal quotation marks omitted); *Edwards v. New York State Unified Court System*, 2012 WL 6101984 at *5 (S.D.N.Y. Nov. 20, 2012) (plaintiff's allegations that her supervisors "told her to work all day, yelled at her, and closely monitored her" describe conduct that is insufficiently severe or pervasive to state a claim).

　　As for the alleged failings in the investigation conducted by Patino and Ostermann (both as to the etchings and Dr. Longo complaint), any argument that they created a hostile environment is foreclosed by the decision in *Fincher v. Depository Tr. and Clearing Corp.*, 604 F.3d 712 (2d Cir. 2010). In that case the Second Circuit rejected the plaintiff's claims that summary judgment was improperly granted, inter alia, on her hostile work environment claim because the failure of the defendant to investigate her discrimination complaint constituted a hostile work environment for her. The Court wrote:

> But the failure to investigate did not by itself alter the terms and conditions of Fincher's employment; rather, it preserved the very circumstances that were the subject of the complaint. Therefore the failure to investigate Fincher's complaint could not itself have contributed to or constituted a hostile work environment. *Cf. Robles v. Argonaut Rest. & Diner, Inc.*, No. 05 Civ. 5553, 2009 WL 3320858 at *8, 2009 U.S. Dist. LEXIS 96949, at *27–28 (S.D.N.Y. Oct. 9, 2009) ("A hostile work environment claim can succeed only if plaintiff demonstrates that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of his employment were thereby altered") (citing Leibovitz v. N.Y. City Transit Auth., 252 F.3d 179, 188 (2d Cir.2001)).

Indeed, although this Circuit has not ruled on the question, in the analogous context of hostile work environment claims based on allegations of sexual harassment, "[federal] courts (including district courts in this circuit) appear to have uniformly rejected the notion that a failure adequately to remediate sexual harassment itself constitutes an act that may contribute to a hostile work environment claim." *Chan v. N.Y. City Transit Auth.*, No. 03 Civ. 6239, 2004 WL 1812818, at *5, 2004 U.S. Dist. LEXIS 16370, at *15 (E.D.N.Y. July 19, 2004).

604 F.3d at 724; *cf. Sassaman v. Gamache*, 566 F.3d 307, 315 (2d Cir. 2009) ("We emphasize that we do not hold that an arguably insufficient investigation of a complaint of sexual harassment leading to an adverse employment action against the accused is, standing alone, sufficient to support an inference of discriminatory intent. Rather, we hold only that where a plaintiff can point to evidence closely tied to the adverse employment action that could reasonably be interpreted as indicating that discrimination drove the decision, an arguably insufficient investigation may support an inference of discriminatory intent.")

Given the undisputed attendant circumstances regarding the etchings, the alleged failings of the investigation would not permit a trier of fact to conclude they created a hostile work environment. Pictures of the etching were taken by IAD and forwarded to Patino and Ostermann so that even if they could have had access to the Medical Unit (and according to the undisputed testimony of Patino, he was advised by IAD that they would not be given such access), such a visit was not necessary. And, given (1) the absence of cameras in the area; (2) the absence of information as to how long the etchings were there before they were discovered by Plaintiff; and (3) that 25 correction officers (according to Plaintiff) and numerous medical and staff members of Armor Health worked in the area, which was also

accessed by inmates, the failure to conduct interviews in an attempt to determine who made the etchings cannot, as already stated, reasonably be viewed as unreasonable.

Similarly, given the attendant circumstances, the failure to investigate Plaintiff's claims regarding Lonigro and Dr. Longo do not support a hostile work environment claim. According to Plaintiff, on October 17, 2014, Lonigro "treated Plaintiff in an abusive, demeaning and unwarranted manner in the medical unit in front of staff an inmates [and] cursed at Plaintiff in front of same." (Pl.'s Mem. at 12.) There is no evidence, however, to even suggest that the incident was because of Plaintiff's race such as to warrant an investigation into the claim. Plaintiff speculation that the incident was prompted by her complaint regarding the etching is that – just speculation. Regarding Dr. Longo, her EEO Complaint Form provided no basis to commence an investigation against the doctor as it described the "incident" as follows:

> I was assigned to Mental Health on 2-5-15 at 12 pm in the D -building.
> Being under Dr. care, I was feeling uneasy about working with Dr.
> Longo the Mental Health Dr. and the officer cursed me out. My
> supervisor said he could not switch my assignment, I asked "Could you
> switch me, I can't work with these racist people." I began to get
> Anxious and I wanted to go home. I told my supervisor Cpl. Gavingan
> "I want to go home" he had a replacement for me and I went home.

(Ex. N to Harris-Marchesi Declar.). Furthermore, Plaintiff was transferred out of the Medical Unit the day after her complaint regarding Dr. Longo.

The last items to be addressed are the failure to transfer her to any of the units she proposed so that she could work only a day shift and the denial of her request for a reasonable accommodation based on her daughter's disability. There is nothing in these incidents that even suggests they are tied to plaintiff's protected status, viz. race. *See Gregory v. Daly*, 243 F.3d 687, 694 (2d Cir. 2001) (there must be "factual circumstances that permit the inference that plaintiff was subjected to a hostile work environment because of his [protected status]"); *Rissman v. Chertoff*, 2008 WL 5191394 at *4 (S.D.N.Y. Dec. 12, 2008) ("[i]n essence, plaintiff alleges that because he was yelled at [by his supervisors], this must have been because [of his protected status]. Such conclusory and speculative statements are insufficient [to support a hostile work environment claim]"). For example, there is no evidence that requests for changes to a particular shift due to the need to care for a child were granted to corrections officers who are not of Plaintiff's protected status.

Finally, the Court notes that Plaintiff relies on other cases filed against the County and its correctional facility to support her claim of a hostile working environment. Because, among other things, plaintiff makes no attempt to demonstrate that the referenced cases involve the same time period as her claim or involved the Medical Unit, they do not help support her claim that hers was a hostile working environment.

The motion for summary judgment on the hostile work environment claim is granted.

### III.   The Retaliation Claim

#### A.    Applicable Law

Title VII also prohibits retaliation against employees who engage in protected activity. *See, e.g., Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002); *Vasquez v. Empress Ambulance Serv., Inc.,* – F.3d –, 2016 WL 4501673 (2d Cir. Aug. 29, 2016). Such retaliation claims are analyzed using the McDonnell Douglas "burden-shifting" formula. *See, e.g., Kessler v. Westchester Cnty. Dep't of Social Servs.*, 461 F.3d 199, 205 (2d Cir. 2006).

To make out a prima facie case of retaliation, a plaintiff must show that "she engaged in protected participation or opposition under Title VII, that the employer was aware of this activity, that the employer took adverse action against the plaintiff, and that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action." *Sosa v. Rockland County Community College*, 2017 WL 3105872 (S.D.N.Y. July 20, 2017) (internal quotation marks omitted); *see Miller v. Praxair*, 408 F. Appx. 408, 409-10 (2d Cir. 2010).

The first element of a prima facie case is that the plaintiff engaged in protected activity and that the employer was aware of this activity. Protected activity for purposes of Title VII include "informal protests of discriminatory employment practices, including making complaints to management." *DeVore v. Neighborhood Housing Servs. of Jamaica, Inc.,* 2017 WL 1034787, *9 (E.D.N.Y. Mar. 16, 2017) (citing *Littlejohn v. City of New York*, 795 F.3d 297, 317-18 (2d Cir.

2015)). Generalized complaints, however, are insufficient; complaints must be sufficiently specific to make clear that the employee is complaining about conduct prohibited by the applicable discrimination statute. *See Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 108 (2d Cir. 2011). "To the extent that an employee complains about perceived 'unfair' treatment relating to job responsibility, hiring practices, or corporate policy, but fails to link the treatment to unlawful discrimination or to his protected status, he fails to establish that he was engaged in protected activity." *Penberg v. HealthBridge Mgmt.*, 823 F. Supp. 2d 166, 191 (E.D.N.Y. 2011) (citing, inter alia, *Velasquez v. Goldwater Memorial Hosp.*, 88 F. Supp. 2d 257, 264 (S.D.N.Y. 2000) (general complaints about corporate policy without linking it to plaintiff's status are insufficient to establish "protected activity" under Title VII).

The second element is that the employer took adverse action against the plaintiff. In the context of "Title VII's antiretaliation provision, unlike the substantive provision," retaliation "is not limited to discriminatory actions that affect the terms and conditions of employment." *Davis-Garett v. Urban Outfitters, Inc.*, -- F.3d --, 2019 WL 1510428, *10 (2d Cir. Apr. 8, 2019) (internal quotation marks omitted). "Instead, the proper question for a retaliation claim is whether the alleged adverse action to which the plaintiff was subjected could well have dissuaded a reasonable employee in his position from complaining of unlawful discrimination." *Id.* (internal quotation marks and brackets omitted).

The last and final element is that a causal connection exists between the protected activity and the adverse action, i.e. that a retaliatory motive played a part in the adverse employment action. *Kessler v. Westchester Cnty. Dep't of Social Servs.*, 461 F.3d 199-205-06 (2d Cir. 2006) (citation omitted). "Causation can be proven (1) directly 'through evidence of retaliatory animus directed against the plaintiff by the defendant;' or (2) indirectly either (a) 'by showing that the protected activity was followed closely by discriminatory treatment,' or (b) through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct.'" *D'Andrea v. Nielsen*, -- F. Appx. --, 2019 WL 1503923, * 2 (2d Cir. April 5, 2019) (quoting *Gordon v. N.Y.C. Bd. of Educ.,* 232 F.3d 111, 117 (2d Cir. 2000). The Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship," *Gorman–Bakos v. Cornell Co-op Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001). It has, however, upheld an inference of a causal connection based on lapses of up to eight months between the protected activity and the alleged retaliatory actions. *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 45–46 (2d Cir. 1980) (eight month gap between EEOC complaint and retaliatory act suggested causal relationship); *see Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009) (inferring causal connection with six-month lapse); *Gorman–Bakos*, 252 F.3d at 554 (same with five month lapse); *see also Cioffi v. Averill Park Central School Dist. Bd of Ed.*, 444 F.3d 158, 168 (2d Cir. 2006) (little over three months in not "too long for any inference of retaliatory motive and causation to be drawn").

"[I]f the plaintiff establishes a prima facie case, 'the burden shifts to the employer to articulate some legitimate, non-retaliatory reason for the employment action.'" *D'Andrea,* --F. App'x --, 2019 WL 1503923, * 2 (quoting *Zann Kwan v. Andalex Grp. LLC,* 737 F.3d 834, 846 (2d Cir. 2013)).

Lastly, if a legitimate non-retaliatory reason for the adverse action is proffered, "the burden shifts back to the plaintiff to show that the defendant's reason is 'a mere pretext for retaliation.' The plaintiff also 'must show that retaliation was a 'but-for' cause of the adverse action, and not simply a 'substantial' or 'motivating factor in the employer's decision.'" *Id.* (quoting *Zann Kwan*, 737 F.3d at 845). While the but-for reason need not be the only reason, a plaintiff must show that "the adverse action would not have occurred in the absence of the retaliatory motive." *Id.* (internal quotation marks omitted).

**B.    Application to the Present Case**

There is no dispute that Plaintiff has satisfied the first prong of a prima facie case of retaliation, i.e. that she engaged in protected activity of which her employer was aware. To the extent that Defendant argues that she has not suffered any adverse action because she is still gainfully employed and maintains the same title and benefits now as she did before her complaint of discrimination, they misperceive the nature of the inquiry. As noted above, Title VII's antiretaliation provision is not limited to discriminatory actions that affect the terms and conditions of employment. Rather, the inquiry is whether the alleged adverse action

could well have dissuaded a reasonable employee in her position from complaining of unlawful discrimination.

In support of her claim of retaliation, Plaintiff identifies the follows acts: (1) the failure to investigate her claim against Lonigro; (2) her transfer to a rotating shift; (3) a December 11, 2014 order directing her to submit to a psychological exam; (4) her transfer to the delivery gate "bubble" in August 2015. Each of the foregoing are acts which could dissuade a reasonable employee from making a complaint and, at least arguably, occurred within a time frame that could support a causal connection. Accordingly, the Court, like the parties, shall focus its discussion on the proffered non-retaliatory reasons for the actions and the question of pretext.

Regarding the lack of investigation into her complaint regarding the incident with Lonigro in which he refused to send in another inmate  and cursed at Plaintiff, there is nothing in that complaint to suggest that the incident occurred because of a protected category. Rather, it appears to be nothing more than a run of the mill dispute between two co-workers. And while Plaintiff opines that he treated her in the manner described earlier because of her complaint regarding the etching, that assertion is mere conjecture. The record does not permit a reasonable trier of fact to conclude that the proffered reason is pretext.

According to Plaintiff. her transfer to a rotating shift, as opposed to a consistent day shift, was an act of retaliation because she specifically requested an assignment to areas where she would work only a day shift and "Defendants knew that Plaintiff had a daughter who required her to be at home during the evening

hours because of the daughter's epilepsy." (Pl.'s Mem. in Opp. at 14.) The proffered

reason for her not receiving any of the duty stations she requested is that the work

hours and work groups she requested are required by the relevant collective

bargaining agreement ("CBA") to be posted and awarded in accordance with the

provisions of the CBA. (*See* Ex. AA to Harris-Marchesi Declar.; Sposato Dep. at

21(stating that every job other than security is posted and there is list of candidates

to choose from; all transfers from an ancillary unit are put into a security platoon).)

The record does not support that this reason is pretextual. Plaintiff does not proffer

any evidence that transfers were made from one ancillary unit to another outside

the posting process. It is also noteworthy that the testimony that Plaintiff cites for

the assertion that Defendants knew of her need to care for her adult daughter at

night does not support that assertion (*See* deposition testimony cited at Pl.'s Mem.

in Op. at 15.)  Tellingly, her transfer request did not specify why she was requesting

the listed units. (Ex. F to Harris-Marchesi Declar.)

Similarly, the evidence before the Court fails to support that the December

11, 2014 directive to submit to a psychological exam was an act of retaliation. The

proffered legitimate, non-retaliatory reason for the action is that the directive was a

result of the November 12, 2014 "Injury Sustained While on Duty Report"

submitted by Plaintiff and the fact that her duties enabled her to carry a weapon. It

is undisputed that that report identified the date of her injury as 9/16/2014 and the

nature of the injury as "mood disorder and headaches, stress." (*See* Ex. P. to to

Harris-Marchesi Declar.; *see also* Pl.'s Mem. in Opp. at 14 (stating she started

seeing a psychologist to treat her anxiety, panic attacks and sleeplessness). There

nothing in the record to support that this explanation is pretext.

The last alleged act of retaliation alleged by Plaintiff is her assignment to the

"delivery gate bubble" which plaintiff contends was punitive in nature. There is,

however, no admissible evidence to support that assertion. The affidavit of Ronald

Lanier, submitted by Plaintiff, as well as Plaintiff's deposition testimony is based on

hearsay and surmise.[6] Moreover, Plaintiff admits that officers who to her knowledge

are not "troublemakers" were assigned to the delivery gate bubble. (Williams. Dep.

at 159.) The explanation provided by Defendants for her transfer to the "bubble" is

that it was necessitated by her restriction to light duty. Plaintiff has not submitted

evidence that there were assignments, other than to a "bubble," which are suitable

for someone who is restricted to light duty.

In sum, the record as presented would not permit a reasonable trier of fact to

conclude that the adverse actions alleged would not have occurred in the absence of

the retaliatory motive. The motion for summary judgment on the Title VII

retaliation claim is granted.

---

[6] The Court also notes that Lanier's affidavit just references assignment to "the bubble" without referencing the delivery gate bubble specifically and, based on the record, there is more than one bubble in the jail. For example, according to Plaintiff's deposition testimony and her EEO complaint Lonigro was in the bubble in the Medical Unit when he refused Plaintiff's request to let another inmate into the Medical Unit.

**IV.    Section 1981 and 1983 Claims**

**A.    Applicable Law**

42 U.S.C. § 1981 provides that all persons within the jurisdiction of the United States shall have the right "to make and enforce contracts." This section prohibits discrimination "with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment." *Patterson*, 375 F.3d at 224 (citing *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 68–69 (2d Cir.2000)). Courts apply the same legal elements and burden-shifting analysis for a Title VII race discrimination claim as they do for a race-based employment discrimination claim under 42 U.S.C. § 1981. *See Johnson v. Cty. of Nassau*, 480 F.Supp.2d 581, 605 (E.D.N.Y.2007) (quoting *Patterson*, 375 F.3d at 225) ("Most of the core substantive standards that apply to claims of discriminatory conduct in violation of Title VII are also applicable to claims of discrimination in employment in violation of § 1981 . . . and the factors justifying summary judgment dismissing Patterson's Title VII claim against the municipal defendants for termination of his employment equally support the summary dismissal of his claims for termination brought under 42 U.S.C. §§ 1981 and 1983.") Likewise, retaliation claims under § 1981 are generally analyzed in the same manner as under Title VII. *Acosta v. City of New York*, 2012 WL 1506954 at *8 (S.D.N.Y. Apr. 26, 2012) ("Claims of retaliation under [Title VII and § 1981] are generally analyzed in the same way, with the same standards of liability.").

"To prevail on a claim under § 1983, a plaintiff must demonstrate the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." See 42 U.S.C. §1983; *Gomez v. Toledo*, 446 U.S. 635, 640 (1980); *Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010); *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999); *Taylor v. Sposato*, 2015 WL 5599178, *2 (E.D.N.Y. Sept. 15, 2015). Here, Plaintiff has shown that the deprivations she alleges were under color of state law because they were committed by state employees acting in their official capacities as County employees. *See, e.g., Feingold v. New York*, 366 F.3d 138, 159 (2d Cir. 2004). Having established action under color of state law, Plaintiff's 1983 claims parallel her Title VII claims. As the elements are generally the same, the Title VII and Section 1983 "must stand or fall together." *Id.*

In general, to prove individual liability pursuant to Section 1981 and 1983, a plaintiff must show that the individual was personally involved in the alleged violations of rights. *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 229 (2d Cir. 2004). Personal involvement for managers and supervisors in this context can include "failure to take action upon receiving information that constitutional violations are occurring. *Id.*

**B.     Application to the Present Case**

Since this Court has granted summary judgment on Plaintiff's Title VII

hostile work environment and retaliation claims, summary judgment is also

appropriate on her §§ 1981 and 1983 claims.[7]

---

[7]  In addition, given the requirement of personal involvement of the individual defendant in the alleged deprivation, the Court notes that the specific acts of the individual defendants are insufficient to support his or her liability for a hostile work environment as demonstrated by the following examples. None of the defendants are alleged to have made the etchings. As to Lonigro, his personal involvement is limited to the incident in which he yelled at Plaintiff.  Even if, arguendo, the argument was race based, this single incident is insufficient to state a hostile work environment 1981 or 1983 claim as against Lonigro. The 1981 and 1983 hostile work environment claims against Ostermann and Patino to the extent they are based on their failure to act on Plaintiff's complaints regarding Lonigro and Dr. Longo cannot survive. Taking the facts regarding the incidents with these two individuals in the light most favorable to Plaintiff, there is nothing in the record to support the proposition that the incidents were because of Plaintiff's race. To the extent the claims against Ostermann and Patino are based on their alleged lack of a "full investigation" into the etchings incident and the alleged inadequacy of their response to the incident (e.g. only having "hate symbols added to the diversity training, as opposed to requiring sensitivity training"), these claims fail for the very same reasons.

       With respect to the alleged acts of retaliation, only Sposato was responsible for Plaintiff's transfer to a position with a rotating shift. Moreover, none of the named defendants were responsible for Plaintiff's assignment to the delivery gate bubble. According to Plaintiff, Captain Jorgenson assigned Plaintiff to this duty. (Pl.'s Mem. in Opp. at 15.) There is no factual information to support that the named individual defendants played any part in this assignment or were even aware of it. Plaintiff has not submitted evidence to permit a trier of fact to conclude that Captain Jorgenson is a final decisionmaker so as to support *Monell* liability. Where, as here, Plaintiffs "seek[ ] to hold a municipality liable for a single decision by a municipal policymaker, [plaintiffs] must show that the official had final policymaking power." *Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir.2008) (citation and internal quotation marks omitted). "[T]he critical inquiry is not whether an official generally has final policymaking authority; rather, the court must specifically determine whether the government official is a final policymaker with respect to the particular conduct challenged in the lawsuit." *Id.* "[T]he question of whether a given official is the . . . final policymaking official in a given area is a matter of law to be decided by the court" "before the case is submitted to the jury." *Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir.2000) (emphasis in original) (internal quotation marks omitted).  Further, "[w]here a plaintiff relies not on a formally declared or ratified policy, but rather on the theory that the conduct of a given official represents official policy, it is incumbent on the plaintiff to establish that element as a matter of law." *Id.*

## CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment is granted. The Clerk of Court is directed to enter judgment accordingly and to close this case.

**SO ORDERED.**

Dated: Central Islip, New York        _s/ Denis R. Hurley_
       May 28, 2019                   Denis R. Hurley
                                    United States District Judge